**TROY GROUP, INC., et al, Plaintiffs,**

v.

**Whitney TILSON, et al, Defendants.**

**No. SACV 04–1477JVS.**

United States District Court,
C.D. California.

April 1, 2005.

Dechert Law Offices, Palto Alto, CA, for Plaintiffs.

Howard Rice Nemerovski Canady Falk & Rabkin, San Francisco, CA, for Defendants.

*Memorandum re Defendant Whitney Tilson's (1) Special Motion to Strike Complaint Under California Code of Civil Procedure § 425.16; and (2) Motion to Dismiss*

SELNA, District Judge.

Defendant Whitney Tilson ("Tilson") seeks an order striking Plaintiffs Troy Group, Inc.'s ("Troy"), Patrick J. Dirk's and Brian P. Dirk's (collectively, "Troy Parties") Complaint under California Code of Civil Procedure § 425.16 ("Section 425.16" or "anti-SLAPP statute"). Tilson brings this motion on the grounds that the Troy Parties' claim against Tilson arises from an act by him "in furtherance of [his] right of petition or free speech under the United States or California Constitution in connection with a public issue" and that the Troy Parties cannot establish a probability that they will prevail on their Complaint. The Court grants the motion.

Tilson also moves this Court for an order dismissing the Troy Parties' Complaint, without leave to amend, pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). This motion is moot in light of the Court's disposition of Tilson's Special Motion to Strike.

## I. Background

This action arises out of an email that Tilson sent on September 8, 2004 ("September 8 email") to John Lewis, a managing partner of Osmium Partners; Glenn Tongue, Tilson's co-manager of Tilson Growth Fund L.P.; Henny Sender, a reporter for *The Wall Street Journal*; and, according to Tilson, Randall Steinmeyer, Tilson's counsel in his stock fund's then-pending suit against Troy. The September 8 email stated:

> Attached are the amended proxy and BEAR's fairness opinion, plus below is the announcement of TROY's suit against Westar. Are these guys the biggest crooks on the planet or what?

(Complaint, ¶ 8; Mot'n to Dismiss, Ex. A.)

On the basis of the September 8 email, the Troy Parties filed the complaint in this action seeking relief for defamation against Tilson.

## II. Request for Judicial Notice

As an initial matter, the Court treats the Troy Parties' Request for Judicial Notice. The Troy Parties have asked this Court to take judicial notice pursuant to Federal Rule of Evidence 201 of five documents filed with the Securities and Exchange Commission ("SEC"), as well as three filings with the Orange County Superior Court. The Troy Parties contend that judicial notice of these documents is appropriate because they are publicly available and their content is "capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned." *Kramer v. Time Warner,* 937 F.2d 767, 774 (2d Cir.1991).

Tilson, however, opposes judicial notice. While admitting that courts routinely take judicial notice of SEC and court filings, Tilson argues that judicial notice is improper here because the Troy Parties seek to rely on the truth of the statements contained in the relevant documents.

Indeed, when resolving disputes, courts may "not take judicial notice of court documents provided for the truth of the facts asserted therein" when such documents contain "facts essential to support a contention in a cause then before it." *BP West Coast Prods. v. May,* 347 F.Supp.2d 898, 901 (D.Nev.2004). Similarly, SEC filings "should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents." *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1018 (5th Cir.1996).

The Court agrees with Tilson that, on several occasions in their Oppositions, the Troy Parties rely on the truth of statements contained in the documents for which they seek judicial notice. Accordingly, the Court only takes judicial notice of what these documents actually contain. The Court does not take judicial notice of the truth of those contents.

### III. Legal Standard

#### A. *Special Motion to Strike Complaint Under California Code of Civil Procedure § 425.16*

Under California's anti-SLAPP statute, a complaint is subject to a motion to strike if it arises from the speech of the defendant in connection with a public issue, unless the plaintiff can establish a probability of prevailing on the complaint. CAL. CIV. PROC. CODE § 425.16(b)(1). In ruling on a special motion to strike, the trial court must first determine whether the moving party "has made a threshold showing that the challenged cause of action is one arising from protected activity." *Equilon Enters., LLC v. Consumer Cause, Inc.* 29 Cal.4th 53, 67, 124 Cal.Rptr.2d 507, 52 P.3d 685 (2002). Once the defendant satisfies this initial burden, the burden then shifts to the plaintiff to establish a probability of success on its claim. *Wilbanks v. Wolk,* 121 Cal.App.4th 883, 894, 17 Cal.Rptr.3d 497 (2004). This burden requires the plaintiff to "demonstrate the complaint is legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment." *Wilcox v. Superior Court,* 27 Cal.App.4th 809, 823, 33 Cal.Rptr.2d 446 (1994) (disapproved on other grounds).

#### B. *Motion to Dismiss*

Dismissal of an action pursuant to Rule 12(b)(6) is proper where the plaintiff fails to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6). Such a dismissal may be based either on the "lack of a cognizable legal theory" or the "absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1988). In reviewing a motion to dismiss, all of the plaintiff's allegations of material fact must be taken as true and construed in the light most favorable to the nonmoving party. *Everest & Jennings v. American Motorists Ins. Co.,* 23 F.3d 226, 228 (9th Cir.1994).

In the specific context of defamation actions, in order to survive a motion to dismiss, a plaintiff must establish both that the words "about which they complain are reasonably capable of sustaining a defamatory meaning," and "that they are not mere comment within the ambit of the First Amendment." *Knievel v. ESPN,* 393 F.3d 1068, 1073–74 (9th Cir.2005).

## IV. Special Motion to Strike Complaint Under California Code of Civil Procedure § 425.16

Both prongs of the anti-SLAPP statute are met here: Tilson has shown that the September 8 email arose from protected speech or petitioning and the Troy Parties have failed to demonstrate a probability of success on their Complaint.

### A. *Matter of Public Interest*

First, as noted above, a defendant bears the initial burden of proving that the anti-SLAPP statute applies to his communication. According to Section 425.16(e)(4), "any conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue" falls within the bounds of the anti-SLAPP statute. CAL. CIV. PROC. CODE § 425.16(e)(4). The parties appear not to dispute that, in drafting and sending the September 8 email, Tilson was exercising his constitutional right of free speech. The parties do differ, however, over whether the September 8 email concerned a public issue or a matter of public interest.

■ Under California law, "it is now well settled that to constitute a public issue, this type of conduct must either impact[ ] a broad segment of society or affect[ ] a community in a manner similar to that of a governmental entity." *O'Meara v. Palomar–Pomerado Health Sys.*, 125 Cal.App.4th 1324, 1336, 23 Cal.Rptr.3d 406 (2005) (internal quotation marks omitted). Several courts have held that the conduct of a publicly traded corporation, including the legitimacy of corporate actions, falls within at least one of these categories.

In *Global Telemedia, Int'l, Inc. v. Doe 1*, 132 F.Supp.2d 1261 (C.D.Cal.2001), the defendants had posted allegedly libelous comments about a company in an internet chat-room. *Id.* at 1264. The federal dis-trict court found that this was an issue of public interest because the company had many investors, had "made itself a matter of public interest by means of numerous press releases" and had voluntarily trumpeted its positive results through the media in order to gain the attention of current and prospective investors. *Id.* at 1265.

Likewise, in *ComputerXpress, Inc. v. Jackson*, 93 Cal.App.4th 993, 113 Cal. Rptr.2d 625 (2001), the California Court of Appeal held that disparaging comments about a company and its officers that the defendant had posted on the internet concerned matters of public interest because the company had many investors and had made use of press releases in order to promote the company. *Id.* at 1005, 1007–08, 113 Cal.Rptr.2d 625. In addition, the court found relevant the fact that the communications had been directed at "existing or potential shareholders rather than potential customers." *Id.* at 1008, 113 Cal. Rptr.2d 625.

Tilson contends that the situation here is nearly identical to those in *Global Telemedia* and *ComputerXpress*. According to Tilson, just as in those cases, the Troy Parties allege that Tilson made a defamatory statement regarding the conduct of a corporation with millions of outstanding shares of common stock. (*See* Declaration of Simon J. Frankel in Support of Defendant's Motion to Strike Complaint [hereinafter "Frankel Decl."], ¶ 2 & Ex. A; *ComputerXpress*, 93 Cal.App.4th at 1008, 113 Cal.Rptr.2d 625 (noting that company had 12 million to 24 million outstanding shares).) Moreover, as in those cases, Troy routinely issues press releases, often promoting the corporation and its stock through the announcement of new products and other corporate activities. (*See* Frankel Decl., ¶ 4 & Ex. C; *Global Tel-*

*emedia*, 132 F.Supp.2d at 1265 (finding relevant that company had "voluntarily trumpet[ed] its good news").)

The Troy Parties strongly disagree with Tilson's characterization of the September 8 email as a matter of public interest. According to the Troy Parties, the situation at hand is easily distinguished from *Global Telemedia* and *ComputerXpress* because, unlike those cases, only one-third of Troy's 10.6 million outstanding shares are held by investors outside the Dirk family. Moreover, according to the Troy Parties, these outside investors only add up to 200 shareholders. In addition, the Troy Parties argue that the September 8 email cannot qualify as a matter of public interest within the meaning of the anti-SLAPP statute because it merely concerns a "private ... business-related dispute." (Opp'n, p. 1.)

■ The Court agrees with Tilson that, because, as in *Global Telemedia* and *ComputerXpress*, Troy repeatedly used press releases in its efforts to promote the company, the stock and, most importantly, the company's contemplated going-private transaction (Frankel Decl., Exs. C–I), the September 8 email concerns a matter of public interest. This conclusion finds confirmation in the fact that *The Wall Street Journal* ran a detailed story about the Dirk family's efforts to take the company private and the objections (and lawsuits) of certain investors, including Tilson and Osmium Partners.

In addition, the Court rejects the Troy Parties' argument that *Global Telemedia* and *ComputerXpress* are distinguishable on the ground that the companies in those cases had more shareholders than Troy. Although the courts in those cases did refer to the companies' numerous outstanding shares, in neither case did the court establish a strict cut-off on the number of shareholders required for a compa-

ny's transactions to be of public interest. Accordingly, the Court finds that the subject of the September 8 email qualifies as a matter of public interest notwithstanding the fact that Troy's beneficial shareholders numbered only 1,634. (Declaration of Robert Agosta, ¶ 2 & Ex. A.)

Furthermore, the Court's finding that the September 8 email references a matter of public interest is unchanged by the Troy Parties' reference to *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 63 F.Supp.2d 1127 (N.D.Cal.1999), which found that the public interest test cannot be met by statements of one company regarding one of its competitors. Unlike in *Globetrotter*, Tilson was "speaking not as [a] competitor[ ], but simply as [an] investor[ ]." *Global Telemedia*, 132 F.Supp.2d at 1266. In addition, as the court in *Global Telemedia* noted, even though the *Globetrotter* court "explicitly rejected applying the anti-SLAPP provisions to cases involving business competitors," it "equally clearly did not reject the use of the provisions to all commercial cases or to all cases involving trade libel." *Id.*

Finally, the Court disagrees with the Troy Parties' contention that the Complaint is not subject to the provisions of Section 425.16 because it falls in one of the exceptions set forth in California Code of Civil Procedure § 425.17 ("Section 425.17"). Under Section 425.17, the anti-SLAPP statute does not apply to "any cause of action brought against a person primarily engaged in the business of selling or leasing goods or services, including but not limited to ... securities, or financial instruments, arising from any statement or conduct of that person" if two criteria are satisfied. Cal. Civ. Proc. Code § 425.17(c). First, the statement must be about the speaker's or a business competitor's business and must be made to obtain

sales or leases of goods or services, or must have been made in the course of delivering the person's goods or services. CAL. CIV. PROC. CODE § 425.17(c)(1). Second, the intended audience must be an actual or potential buyer or be likely to repeat the statement to a potential buyer or customer. CAL. CIV. PROC. CODE § 425.17(c)(2). Both criteria must be met to establish the exception.

The Troy Parties have not shown how either criteria is satisfied here. The September 8 email is clearly not about Tilson's business, rather it is about Troy, which, as the Troy Parties admit, is not a business competitor of Tilson. (Opp'n, p. 5.) Furthermore, the September 8 email was not made to obtain approval for or promote Tilson's goods or services, or made in the course of delivering his goods or services. Finally, the Troy Parties fail to show that the intended audience included an actual or potential buyer or purchaser, or that the allegedly defamatory statement would likely be repeated to such an individual. Accordingly, the exception codified in Section 425.17 has no application here.

Based on the foregoing, the Court finds that Tilson has satisfied his burden of showing that his September 8 email was "in connection with an issue of public interest" under Section 425.16. Accordingly, the email falls within the bounds of California's anti-SLAPP statute.

**B.** *Probability of Success on Complaint*

Because Tilson has made a prima facie showing that the allegedly defamatory remarks concern a matter of public interest, the Complaint will be stricken unless the Troy Parties can demonstrate a probability of success on their claim. *Wilbanks,* 121 Cal.App.4th at 901, 17 Cal.Rptr.3d 497. The Court finds that they have failed to do so.

In order to meet their burden, the Troy Parties needed to "demonstrate that the complaint is legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the plaintiff's evidence is credited." *Id.* As such, the Troy Parties had to go beyond the pleadings and present admissible evidence showing a probability of success at trial. *Nicosia v. De Rooy,* 72 F.Supp.2d 1093, 1110 (N.D.Cal.1999).

In their Complaint, the Troy Parties assert a single cause of action for defamation. According to the Ninth Circuit, for a claim of defamation to be legally sufficient, a plaintiff must establish that the words "about which they complain are reasonably capable of sustaining a defamatory meaning," and "that they are not mere comment within the ambit of the First Amendment." *Knievel,* 393 F.3d at 1073–74. Here, the Troy Parties fail to demonstrate a probability of success on either point.

*1. Susceptibility of Defamation*

■ First, the Troy Parties have not shown that the September 8 email is reasonably susceptible of a defamatory meaning, much less defamatory *per se.* Whether or not a challenged statement is fairly susceptible of a defamatory meaning is a question of law, *see Dodds v. ABC, Inc.,* 145 F.3d 1053, 1065 (9th Cir.1998), and the determination should be made "from the standpoint of the average reader, judging the statement not in isolation, but within the context in which it is made." *Norse v. Henry Holt & Co.,* 991 F.2d 563, 567 (9th Cir.1993); *see also Franklin v. Dynamic Details, Inc.,* 116 Cal.App.4th 375, 389, 10 Cal.Rptr.3d 429 (2004) ("courts look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication is directed") (internal quotation marks omitted). In *Knievel,* a case involving a

photograph caption that read "Evel Knievel proves that you're never too old to be a pimp," the Ninth Circuit applied this standard and found that, while "the word 'pimp' may be reasonably capable of a defamatory meaning when read in isolation ... the term loses its meaning when presented in the context ·here." 393 F.3d at 1074.

Similarly, Tilson argues that, while the use of the word "crooks" may, in certain contexts, carry a defamatory meaning, the particular language of the September 8 email could not support a defamatory meaning. According to Tilson, this is because the email does not actually accuse the Troy Parties of being "crooks" and never accuses them of committing a particular crime. The Troy Parties, however, disagree, asserting that the average reader to whom the statement was addressed (i.e., investors in Troy and a *Wall Street Journal* reporter) actually would understand that the email implicitly accuses them of criminal and dishonest conduct in their occupations and business affairs. In support of their position, the Troy parties cite two California state cases, *Williams v. Seiglitz,* 186 Cal. 767, 200 P. 635 (1921) and *Albertini v. Schaefer,* 97 Cal.App.3d 822, 159 Cal.Rptr. 98 (1979), in which the courts held that statements that individuals were "crooks" constituted defamation *per se.*

■ Upon review of the September 8 email, the Court finds itself in agreement with Tilson that, given its phrasing and context, the email is clearly not susceptible of any defamatory meaning. As discussed in more depth below, the email, with its colloquial, exaggerated and non-literal language, simply could not be interpreted as actually accusing the Troy Parties of a crime or even dishonesty. The cases that the Troy Parties cite to show that California courts have found use of the word

"crooks" to constitute defamation, *Seiglitz* and *Albertini,* are distinguishable.

In *Albertini,* the words "crook" and "thief" were used in an unvarnished fashion, and there was nothing to suggest that any other non-defamatory meaning was intended. *Albertini,* 97 Cal.App.3d at 826, 159 Cal.Rptr. 98. In *Seiglitz,* the word "crooks" was used in a context that confirmed and embroidered on the notion of criminal conduct:

> The alleged slander consisted in appellant having said, speaking of and concerning respondent and his brother, that "they are not men who are entitled to support; they are crooks," that they "were run out of a place in Arizona," that "the people [meaning the people of Calexico] will find it out," that "somebody left a diamond with the Williams brothers in Arizona, and they got away with it," that "some persons are going after them legally on some crooked deals they were mixed up in before they came to Calexico," and that "they cannot get goods through wholesale houses."

(186 Cal. at 768–69, 200 P. 635.) In each case, the defaming parties affirmatively asserted that the plaintiffs were, in literal terms, crooks, whereas here, Tilson used the word "crooks" in a clearly exaggerated rhetorical question that does not lend itself to a literal interpretation by the average reader.

*Knievel 's* guidance to consider the context is confirmed by everyday conversation. 393 F.3d at 1074. It is easy to see that context can dull the literal meaning of even the most volatile language. Theft is, without a doubt, a crime. But if one shopper observed that his fellow shopper went to a major department store's semi-annual sale, and remarked, "He stole that cashmere sports coat for a song," not even a hint of criminal conduct would arise in the mind of the average listener. Murder is

an even greater crime. However, if an attendee at a social event observed another's stunning evening gown and remarked, "I would kill for a dress like that," no one would assume that the object of the comment or anyone else was in danger for her life.[1] Indeed, the average listener would likely deem the remark a compliment.[2]

Here, context similarly dulls the meaning of "crook." From Tilson's statement, it is clear that Tilson is unhappy with the situation. But he does not measure the Troy Parties' conduct against the relevant securities laws or contemporary ethics in the American business community. In the September 8 email, Tilson does not charge or even hint at violations of the securities laws; indeed, the reference to the fairness opinion is a sign of compliance with the securities laws.[3] Rather, Tilson's context is the planet. The average listener would not regard the planet as a bench mark for criminal conduct, and one would be hard pressed to think of what world famous crooks Tilson is calling up for comparison.[4] At this point, context has obliterated the literal meaning of the term "crook."

Accordingly, the Court concludes that the September 8 email is not susceptible of a defamatory meaning and, also, cannot constitute defamation *per se.*

### 2. *Protected Opinion*

■■■■ Even if the Troy Parties had established that the September 8 email is susceptible of a defamatory meaning, the Troy Parties would still fail to demonstrate probable success on their Complaint be-

cause the email is not a statement of fact, but, rather, an opinion couched in rhetorical hyperbole protected by the First Amendment.

■■■■ It has long been the rule that the First Amendment protects from liability "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual." *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (*quoting Hustler Magazine v. Falwell,* 485 U.S. 46, 50, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988)); *see also Gregory v. McDonnell,* 17 Cal.3d 596, 600–01, 131 Cal.Rptr. 641, 552 P.2d 425 (1976) ("An essential element of libel . . . is that the publication in question must contain a false statement of *fact.*") (emphasis in original). Accordingly, statements of opinion are protected by the First Amendment unless they "imply a false assertion of fact." *Milkovich,* 497 U.S. at 19, 110 S.Ct. 2695.

This rule protecting certain types of opinions is based upon a "recognition of the reality that exaggeration and non-literal commentary have become an integral part of social discourse." *Knievel,* 393 F.3d at 1074 (quotation omitted). In addition, protecting those statements that are not provably false ensures that "public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our nation." *Milkovich,* 497 U.S. at 20, 110 S.Ct. 2695 (*quoting Falwell,* 485 U.S. at 53–55, 108 S.Ct. 876). "Thus, statements of 'rhetorical hyperbole' aren't sanctionable, nor are statements that use

---

1. Despite the horrendous nature of murder, colloquial speech has woven the word into many non-criminal contexts. Salesmen are often murdered by the competition. Athletes vow to murder the opposition on the field. Even loving parents can be heard to express in exasperation, "I am going to kill that kid when he gets home." In the esoteric world of

computer software, there are killer applications.

2. Although perhaps one tinged with jealousy.

3. *See* SEC Rule 13e–3 and Schedule 13E–3.

4. Indeed, the word planet itself can have fanciful connotations.

language in a 'loose, figurative sense.'" *Standing Committee on Discipline v. Yagman,* 55 F.3d 1430, 1438 (1995) (*citing National Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 284, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974); *Greenbelt Coop. Publ'g Ass'n v. Bresler,* 398 U.S. 6, 14, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970)).

■ Under California law, the issue of whether a communication is a factual assertion or a protected opinion "is a question of law to be decided by the court." *Baker v. Los Angeles Herald Examiner,* 42 Cal.3d 254, 260, 228 Cal.Rptr. 206, 721 P.2d 87 (1986). In deciding this question, "courts have regarded as opinion any 'broad, unfocused and wholly subjective comment,'" *Copp v. Paxton,* 45 Cal. App.4th 829, 837, 52 Cal.Rptr.2d 831 (1996) (*quoting Fletcher v. San Jose Mercury News,* 216 Cal.App.3d 172, 191, 264 Cal. Rptr. 699 (1989)), and, similar to a determination of whether a statement is susceptible of a defamatory meaning, courts must examine the "totality of the circumstances in which [a statement] was made." *Underwager v. Channel 9 Australia,* 69 F.3d 361, 366 (9th Cir.1995).

As noted above, the First Amendment only protects certain types of opinions, *i.e.,* those that do not imply an assertion of objective fact. *Milkovich,* 497 U.S. at 18–19, 110 S.Ct. 2695. The Ninth Circuit has found that such protected opinions are those in which the speaker or writer discloses all the facts upon which a statement is based and does not imply that there are other, unstated facts supporting the opinion. *Yagman,* 55 F.3d at 1439. According to the Ninth Circuit, the "rationale behind this rule is straightforward: When the facts underlying the statement of opinion are disclosed, readers will understand that they are getting the author's interpretation of the facts presented." *Id.* Moreover, when the speaker or writer discloses the basis for his or her opinion, "readers are free to accept or reject the author's opinion based on their own independent evaluation of the facts." *Id; see also Global Telemedia,* 132 F.Supp.2d at 1268 (finding that a comment on a public document provided to the reader expresses an opinion rather than a fact because the "reader may look at the same document and determine what they think of the information").

■ On the other hand, as one might expect, courts have found that expressions of opinion based on implied facts or that give rise to the inference that there are undisclosed facts underlying the opinion are actionable even though phrased as the speaker's or writer's personal belief. *Milkovich,* 497 U.S. at 18–19, 110 S.Ct. 2695. *See also Yagman,* 55 F.3d at 1439 (noting that expressions of opinion based on implied facts are actionable); *Lauderback v. American Broadcasting Companies,* 741 F.2d 193, 195–96 (8th Cir.1984) ("it is conceded that statements clothed as opinion which imply that they are based on undisclosed, defamatory facts are not protected"); *Copp,* 45 Cal.App.4th at 837, 52 Cal. Rptr.2d 831 ("A statement of opinion, however, may still be actionable if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.") (citations omitted). Likewise, the Supreme Court has held that "[e]ven if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact" and be actionable. *Milkovich,* 497 U.S. at 18–19, 110 S.Ct. 2695.

When the "totality of the circumstances" surrounding the September 8 email is considered, the Court finds that it clearly constitutes opinion and rhetorical hyperbole protected under the First Amendment. No reasonable recipient of this

email would believe that Tilson intended to convey a factual assertion that the Troy Parties are "crooks." [5]

First, in his allegedly libelous remarks, Tilson clearly indicates that he is expressing an opinion, rather than a fact, by referring to and actually attaching the amended proxy, the BEAR fairness opinion and Troy's press release regarding Troy's attempted going-private transaction. By providing these documents, Tilson discloses to his audience the facts upon which his opinion is based. Because the allegedly defamatory statement containing the word "crooks" follows closely on the heels of the list of documents included in the email, the average reader would understand that Tilson's opinion was based entirely and exclusively upon these documents. Moreover, given the sequence of the phrases, list of documents followed by allegedly defamatory statement, no reader would believe that Tilson's opinion was based upon other, unstated facts. In addition, because Tilson included the documents from which he drew his opinion of the Troy Parties, his readers were free to read the documents and draw their own conclusions, either accepting or rejecting that of Tilson. Finally, contrary to Troy's suggestion at oral argument, Tilson's declaration on this motion does not support the notion that there were undisclosed facts supporting his statement; Tilson's knowledge base is explicit. (*See* Tilson, Decl., ¶¶ 8–9.)

Second, even though, from this opinion, it is clear that Tilson is unhappy with the situation at Troy, the phrase containing the word "crooks" is obviously hyperbole,

a statement that "even the most careless reader" would have perceived as "a vigorous epithet" used to express the opinion that the Troy Parties' position was "extremely unreasonable." *Greenbelt,* 398 U.S. at 14, 90 S.Ct. 1537. As noted above, the context for Tilson's remark is the planet, a bench mark the average listener would not use for criminal conduct.[6]

Third, as evidenced by the fact that Tilson does not measure the conduct of the Troy Parties against any relevant securities laws or contemporary ethics in the American business community or even charge a specific crime, Tilson's comment is precisely the type of "broad, unfocused and wholly subjective comment" that courts have typically regarded as opinion. *Fletcher,* 216 Cal.App.3d at 191, 264 Cal. Rptr. 699. This is not a case where the comment is provably false. *Cf. Wilbanks,* 121 Cal.App.4th at 904, 17 Cal.Rptr.3d 497.

Finally, the Court finds the fact that the remark in the September 8 email comes not as a statement but as a rhetorical question is further affirmation that the email was an opinion, rather than an assertion, and the type of exaggerated, figurative and hyperbolic speech that the First Amendment protects.

Based on the foregoing, the Court finds that it is very unlikely that a trier of fact would find Tilson liable for defamation based on the September 8 email; rather, a jury would likely find the email to be opinion and rhetorical hyperbole.

Accordingly, the Court finds that the Troy Parties have failed to demonstrate a probability of success on their claim. As a

---

**5.** As indicated in the preceding section, the Court believes that the context here precludes a literal meaning of the term "crook." At a minimum, however, the context confirms that Tilson's statement is opinion and hyperbole.

**6.** In some respects, Tilson's remark is tame compared to some remarks in *Global Telemedia* where one plaintiff was purportedly "busted" by the SEC; another intended to "fly[] the coop" with investors' money. 132 F.Supp.2d at 1268–69.

result of this failure, and because the Court has found the September 8 email to concern a matter of public interest, the two prongs the anti-SLAPP statute analysis have been satisfied. CAL. CIV. PROC. CODE § 425.16. The Court must, therefore, grant Tilson's special motion to strike the Troy Parties' Complaint under Section 425.16.[7]

### C.  *Further Discovery*

In connection with their Opposition to this motion, the Troy Parties have requested a continuance to conduct discovery should this Court be inclined to grant Tilson's motion to strike under Section 425.16.  The Court denies this request because the only discovery the Troy Parties have requested is irrelevant due to the fact that it relates only to the common interest privilege and special damages, arguments this Court does not reach because of its findings under Section 425.16.  *See* Footnote 8.

### V.  Motion to Dismiss

In light of the foregoing, the Troy Parties' motion to dismiss and Tilson's Objection to the Declaration of Valerie M. Wagner are moot.  Accordingly, the Court declines to address these here.

---

7.  Because the Court has found both prongs of the Section 425.16 analysis to have been met, the Court need not reach Tilson's arguments regarding the "common interest" privilege or the privilege associated with judicial proceedings.  Also, because the Court found that the September 8 email was not susceptible of a defamatory meaning, the Court did not need to address the parties' arguments regarding whether the Troy Parties had sufficiently pled a claim for special damages.